Joseph M. CEBULA, Plaintiff,

v.

GENERAL ELECTRIC
COMPANY, Defendant.

No. 84 C 1198.

United States District Court,
N.D. Illinois, E.D.

July 17, 1985.

Michael T. Hannafan, Adrianne S. Harvitt, Hannafan & Handler, Ltd., Chicago, Ill., for plaintiff.

Arthur B. Smith, Jr., Thomas G. Abram, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The General Electric Company ("GE") fired Joseph Cebula ("Cebula") on August 29, 1983. Cebula, who was 45 years old at the time, had worked for GE for about five years. He alleges that GE dismissed him because of his age, violating the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* Cebula also alleges that when his supervisor taped his conversation during the termination meeting, GE violated the Illinois Eavesdropping Act, Ill.Rev.Stat. ch. 38, §§ 14–1 to 14–9 (1983). GE has moved for summary judgment, while Cebula has moved for partial summary judgment on the eavesdropping claim. For the following reasons, GE's motion is granted as to both claims and Cebula's motion is denied.

*Facts*

The following material facts are undisputed. Cebula began working for GE in 1978 as a Customer Service Representative. His responsibilities included installing and servicing x-ray and other medical diagnostic imaging equipment at medical institutions. GE provided Cebula with service and equipment training.

GE reviewed Cebula's performance regularly. Cebula's immediate supervisor Walter Taken ("Taken") and his manager James Fetterman ("Fetterman") reviewed his performance for the first time on March 28, 1979. Cebula's overall performance was rated "acceptable," while his overall appraisal was rated "satisfactory." The possible ratings included, in ascending order, unacceptable, acceptable, satisfactory, fully satisfactory, excellent and outstanding.[1] Taken also noted that Cebula needed to continue to develop his technical base and become familiar with GE's basic products.

At the conclusion of Cebula's first year of employment with GE, Taken and Fetterman rated his performance "satisfactory." However, they warned him to "rapidly" expand his technical knowledge about GE products. Further, they suggested that he take more tape courses in order to stay current on GE products.

On November 28, 1980, Taken and Fetterman reviewed Cebula's performance for the third time. Although his work rated "fully satisfactory," Taken and Fetterman listed areas that needed improvement. They noted that Cebula still needed further training to improve his technical knowledge especially in newer equipment and image systems.

On March 31, 1982, Taken and Fetterman reported that Cebula's performance had declined. They lowered his rating to "acceptable," and they stated that "for time in

---

1. "Fully satisfactory" is the minimum par that GE expects of its employees over the long run. According to deposition testimony of Daniel Peters, a GE Manager, "fully satisfactory means that an employee is performing to the expectations of the Company in his particular job category." Peters Deposition at 72–73. The practice in Peter's division was to put employees receiving lower evaluations on a work improvement program. Cebula was eventually placed on such a program.

position, fundamental knowledge of simple systems is below our expectations." Moreover, they indicated that Cebula needed to broaden his electrical skills to fit the criteria of his position. They also noted that some customers had complained that he was unable to fix problems in a timely manner.

Cebula's fifth performance review was completed by Taken and a new district manager, Ravi Sharma ("Sharma"). The evaluation dated February 11, 1983, indicated that while his performance was acceptable, his performance was still declining. Specifically, Taken and Sharma indicated that Cebula frequently failed to arrive at a logical problem solution due to his troubleshooting difficulty. Moreover, he had not mastered skills that were usual for time and position. They suggested that Cebula attend night classes at DeVry Institute in order to fill in his electronic gaps. Cebula did not enroll for classes at DeVry Institute or elsewhere. He asserts that this is because Sharma and Taken did not answer his questions about which courses to take.

Sharma further investigated Cebula's work performance. He consulted a field engineer and another customer service representative who confirmed Cebula's work deficiencies. The field engineer had observed Cebula working and described him as "technically incompetent." Similarly, the customer service representative reported that Cebula frequently required him to provide back up technical assistance by telephone. He opined that Cebula's problem was toubleshooting.

On February 18, 1983, Sharma placed Cebula on a 60-day work improvement program. After the 60-day period, GE would decide whether or not to fire him. Before the program could be formally implemented, Cebula took disability leave from March 4, 1983, until June 13, 1983, because of a hernia operation. Upon his return from leave, Taken gave him a memorandum summarizing the February 1983 perform-

ance appraisal and informing him that his performance would be reviewed over the next 60 days. Cebula disagreed with the assessment of the February meeting and refused Sharma's request to initial his summary of that meeting. Sharma gave Cebula the opportunity to be evaluated by another supervisor, but he declined. Cebula has admitted that he does not believe that Taken or Sharma are personally prejudiced against him because of age.

While Cebula was on the work improvement program, Cebula was cited in four "incident reports" prepared by Taken for failure to perform adequately on customer service calls. Taken also received during that time three letters from GE customers complaining about Cebula's work. Taken had never received such letters before about Cebula. Two of the customers instructed GE not to send Cebula to their hospitals in the future.

On August 23, 1983, Cebula's final performance review indicated that his work was unacceptable. Taken and Sharma met with him six days later when he was told he was fired. GE's reasons for firing Cebula were set out in a memorandum given to him:

1) Your technical performance is unacceptable;

2) You have not made any effort to improve technically, despite repeated requests; and

3) Your attitude towards customers is to a point where it is becoming a liability.

Cebula later discovered that Taken had tape recorded this meeting. GE had destroyed the tape after Taken, Sharma and Daniel L. Peters, Field Employee Relations Manager, had listened to it.

Cebula appealed his termination. GE upheld the dismissal despite ten letters written by its customers (at time of appeal) praising Cebula's performance. Cebula filed timely charges against GE with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission before instituting this suit.[2]

---

2. We reject as irrelevant GE's argument that the

Court lacks jurisdiction over any claims which

*Proving an ADEA Violation*

Cebula alleges that GE violated his rights under the ADEA. We have twice recently ruled on summary judgment motions in ADEA cases and will summarize the well-established standards set forth in those cases. *See Oxman v. WLS–TV,* 609 F.Supp. 1384 (N.D.Ill.1985); *Selsor v. Callaghan,* 609 F.Supp. 1003 (N.D.Ill.1985). Section 623 of the ADEA makes it illegal for an employer "to discharge any individual ... because of such individual's age." 29 U.S.C. § 623(a). Cebula must prove that "but for" his age, GE would not have fired him. *See LaMontagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1409 (7th Cir.1984). Cebula may try to meet his burden in two ways, direct and indirect. He may do so directly by presenting evidence that age was a determining factor in GE's decision to fire him. *Id.* He may also do so indirectly by using the "indirect" proof method created in *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See LaMontagne,* 750 F.2d at 1409.

Cebula appears to rely on the *McDonnell-Douglas* method of proof, which has been modified for the context of ADEA termination cases like this one. *See, e.g., LaMontagne,* 750 F.2d at 1409 n. 1; *Selsor v. Callaghan,* 609 F.Supp. at 1006. To establish a *prima facie* case of age discrimination, Cebula must show:

(1) He was in the protected age group, that is, age 40 to 70;

(2) He was performing his job at a level that met his employer's legitimate expectations;

(3) He was fired; and

(4) His employer sought a replacement for him.

*LaMontagne,* 750 F.2d at 1409; *Selsor* at 1006. Once Cebula meets this burden, the presumption is that he was dismissed because of his age.

GE may rebut a presumption of age discrimination by articulating a lawful reason for the discharge. This burden is merely one of production. The burden of proof always rests on the plaintiff. *See, e.g., Selsor,* at 1006. If GE articulates a legitimate reason for firing Cebula, Cebula must prove that the articulated reasons are pretextual. A pretext is demonstrated by evidence showing that GE was more likely motivated by a discriminatory reason or that its justification is not credible. *See, e.g., LaMontagne,* 750 F.2d at 1409, *citing Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

Having established the substance of our analysis, we turn to the procedural forces which shape that substance. Courts are reluctant to grant summary judgment in employment discrimination cases because so much turns on an employer's credibility and hidden or subconscious motives. Thus, where a genuine issue of employer motive or credibility lay at the heart of an ADEA case, we denied summary judgment. *See Oxman,* at 1393–95. But we have granted summary judgment to an employer where no credible evidence called an employer's motive and intent into question. *See Selsor,* 609 F.Supp. at 1007; *also Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1218 (7th Cir.1980), *cert. denied* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). As usual, summary judgment will be granted only if GE, the moving party, shows that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984). We must view the evidence, as well as the reasonable inferences it creates, in the light most favorable to Cebula. *See Big O Tire Dealers, Inc. v. Big O Warehouse,* 741 F.2d 160, 163 (7th Cir. 1984). If GE fails to carry its "strict burden," it loses the motion. *Id.* But if GE

arose before March 18, 1983, which was 180 days before Cebula filed his EEOC charge. Cebula is not raising any claims which arose before March 18, 1983. He challenges his termination of August 1983, and GE does not dispute that Cebula's EEOC charge was timely as to that claim. Evidence of acts which happened before March 18, 1983, may be considered to prove Cebula's claim that arose in August 1983.

succeeds in doing so, Cebula must carry the resulting burden of creating a genuine issue. He cannot rest on the pleadings or bald assertions in meeting this burden. Fed.R.Civ.P. 56(e); *Big O*, 741 F.2d at 163.

### Cebula's McDonnell-Douglas Case

■ The parties agree that Cebula meets three of the requirements of the *McDonnell-Douglas prima facie* case. At 45 years old, Cebula comes under the statute's protective umbrella. Secondly, he was fired. Third, GE replaced him with a 26 year old man. The parties disagree on whether Cebula satisfied GE's legitimate expectations.

The Seventh Circuit has emphasized that the *employer's* legitimate perceptions are what count in this analysis. For example, *Kephart v. Institute of Gas Technology*, 630 F.2d 1217 (7th Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981), adopted the decision of the district court to grant summary judgment to the employer. The lower court had framed the issue as follows:

> The Age Discrimination in Employment Act, however, was not intended as a vehicle for judicial review of business decisions. *See Havelick v. Julius Wile Sons & Co.*, 445 F.Supp. 919, 926 (S.D.N.Y.1978). The question before the court is not whether the company's methods were sound, or whether its dismissal of Kephart was an error of business judgment. The question is whether he was discriminated against because of his age. Although an employer may not make unreasonable expectations, and must make the employee aware of just what his expectations are, beyond that the court will not inquire into the defendant's method of conducting its business. If Kephart was not doing what his employer wanted him to do, he was not doing his job.

630 F.2d at 1223. In *Huhn v. Koehring Co.*, 718 F.2d 239 (7th Cir.1983), the court relied on *Kephart* in again emphasizing that the plaintiff's burden is to show that he was satisfying his *employer's* legitimate expectations. 718 F.2d at 244–45.

We do not think there is a genuine issue that Cebula was not satisfying GE's legitimate expectations. Although until 1983 Cebula's reviews had indicated that his work had been generally satisfactory, these reviews consistently criticized aspects of his work, especially his technical knowledge and fell below GE's "par" of "fully satisfactory." His performance had declined even before Sharma became his new district manager. The record supports the final performance review which concluded that GE found his work unacceptable. Cebula was consistently criticized for inferior technical expertise. In Cebula's closing days, three of GE's customers complained about his service, two of them asking for different servicemen for the future. And Taken wrote up four "incident reports" about Cebula, which criticized him for inadequate performance on service calls.

■ Cebula has not controverted the above evidence that he did not live up to GE's expectations. He submitted ten letters which he had solicited from GE customers who liked his work, apparently to disprove GE's claim that he was unsatisfactory. However, these letters were written *after* Taken and Sharma decided in August 1983 to fire him. Moreover, Cebula's submission of these letters misses the point made in *Kephart* that we do not sit to judge whether GE made the right business decision in firing Cebula. We sit only to judge whether Cebula's age determined that decision. Cebula, like Kephart, cannot prevail on the *McDonnell-Douglas prima facie* case because he

> does not contradict the affidavits and depositions of other [GE] employees stating that they thought his work was unsatisfactory. In response, he offers only the judgments of some who thought his work was good. These contrary assessments of his performance do not impeach the legitimacy of his employer's expectations. Plaintiff does not raise a material issue of fact on the question of the quali-

ty of his work merely by challenging the judgment of his superiors.

*Kephart,* 630 F.2d at 1223.

Cebula does, however, make some arguments that the above evaluations are a ruse, and that GE's scheme was to get rid of him and other older employees. Essentially, Cebula is arguing that GE's "legitimate expectations" argument is pretextual, papering over its hidden, unlawful motives. The problem with this pretext argument is that we have held that Cebula cannot pass the threshold hurdle of raising a genuine issue of fact for his *prima facie* case. In a strict doctrinal sense, we should not even reach the "pretext" issue, because that presupposes that Cebula had met his *McDonnell-Douglas prima facie* case. Because of his failure to do so, we must now discard the *McDonnell-Douglas* approach and instead analyze Cebula's arguments under the alternate "direct" method of proof, which considers the total circumstances to see whether age was a determining, or "but for," factor in GE's decision to fire Cebula. *See LaMontagne,* 750 F.2d at 1409. In the final analysis, this approach does not differ much from the pretext approach under *McDonnell-Douglas.* In both approaches, we are searching the record for bits of evidence which could show that age motivated GE or that its supposed expectations and evaluations are not credible. 750 F.2d at 1409.

### Cebula's Direct Evidence of Discrimination

Cebula has culled the following bits of evidence to piece together his picture of why he was fired:

(1) According to Cebula's affidavit, Sharma told him, in July 1983 "we [GE] don't want you. Don't you see why we don't want you? Look who we are hiring— Harry Lemke, Scott Ridgeway, and Peter Craig [all of whom are in their twenties]. Don't you see what I am doing to you?" Sharma denies making this statement.

(2) Several co-workers told Cebula that GE was out to get him because of his age, and that GE had a general plan of replacing older employees with younger ones, in order to cut wages and benefits.

(3) Cebula claims that Sharma also told him that if he would quit, Sharma would help him find another job, give him good references, and get him GE benefits. Cebula refused, and Sharma allegedly told him to "quit or get fired."

(4) As of February 7, 1984, GE employed 56 people between ages 20 and 39 in Cebula's area. Only 11 employees were between 40 and 60. Thus, the ratio of "young" to "old" employees was about five to one. One employee over 40 named Robert Wentdorf resigned when Cebula was fired; another, Joseph Ives, was placed on a work improvement program; and GE has hired no one over forty in Cebula's division since 1979.

Only the first of these shreds of evidence helps Cebula's case. We will consider this evidence in reverse order.

■ The so-called "statistical evidence" of paragraph (4) is "sound and fury, signifying nothing." W. Shakespeare, *Macbeth,* Act V, sc. v. The "data" in paragraph (4) is inconclusive, and any inference that it suggests age discrimination would be speculative and unreasonable. The fact that GE has hired no one over 40 in Cebula's division is meaningless absent other evidence concerning the number of applicants over forty, the qualifications of these applicants, and the number of positions available. Similarly, the five-to-one ratio of "young" to "old" employees is statistically meaningless without other evidence concerning the relative percentages of people that applied for these positions, as well as the relative percentages in the work force as a whole. Moreover, because Cebula's position was entry-level, it could just as well be that older employees moved up or into different companies. This inference, too, is speculative. The point is that the evidence by itself points to no one reasonable conclusion. Likewise, the resignation of Robert Wentdorf proves nothing. All we know is that Wentdorf resigned. No evidence describes the circumstances of his resignation. Cebula does not even offer an

affidavit of Mr. Wentdorf. And the assertion that Joseph Ives was placed on a work improvement program is again not probative. There is no evidence that GE lacked good cause to do so, that it treated comparable younger employees better, or even that Ives was fired. In sum, the evidence in paragraph (4) adds nothing to Cebula's case.

▇ Sharma's ultimatum in paragraph (3) to "quit or get fired," coupled with some inducements to quit, also does not suggest that Cebula's age entered into the situation. Sharma could just as well have given the ultimatum because of Cebula's poor performance. Such ultimatums are not uncommon and happen for a variety of business reasons, good and bad. But this ultimatum surely does not imply by itself that age was one of those reasons.

▇ The comments of Cebula's co-workers in paragraph (2) are inadmissible hearsay. Fed.R.Civ.P. 56(e) requires affidavits to "be made on personal knowledge ... set[ting] forth such facts as would be admissible in evidence." Cebula has submitted no affidavits of these co-workers. Rather, his own affidavit repeats comments they made to him that GE was out to get older employees. These assertions are inadmissible hearsay under Fed.R.Evid. 801(c), as they are offered to prove the truth of the matters asserted, that is, that GE was out to get Cebula and other older employees. Cebula is incorrect that these statements are non-hearsay party admissions under Rule 801(d)(2). The "party opponent" here is GE. The statements were made by lower-level GE employees. No evidence suggests that any of these co-workers was involved in the decision to fire Cebula or was speaking as an "agent or

servant [of GE] concerning a matter within the scope of his agency or employment...." Fed.R.Evid. 801(d)(2)(D). Thus, these statements cannot be attributed to GE as an admission and cannot escape the hearsay rule. *See Hill v. Spiegel, Inc.*, 708 F.2d 233, 237 (6th Cir.1983).

▇ The above evidence, considered together or separately, is thus either irrelevant or inadmissible. The final piece of evidence we turn to is Cebula's strongest. That is Cebula's assertion that Sharma told him that "we don't want you," and that he should see who GE was hiring, indicating three younger employees. We note first that Sharma denies making this statement. We observe also that the statement, if made, is facially ambiguous. While Sharma might have pointed to those three as younger employees, Sharma might have meant that the other employees were technically more proficient than Cebula or were better trained. If a jury were to rule for Cebula it would have to find (1) that Sharma really did make the statement; (2) that Sharma meant what Cebula says he meant; and (3) that Cebula's age made a difference in the outcome, despite the powerful evidence that he was not doing his job well enough to satisfy Sharma and others. We think it extremely unlikely that the jury would reach all three conclusions. And we think it impossible that a jury could do so reasonably. First, we do not think a jury would believe that Sharma made the statement.[3] However, in ruling on this summary judgment motion, we must resolve the conflicting stories and credibility issues in Cebula's favor. Nevertheless, even assuming a jury could reasonably find in Cebula's favor on points (1) and (2), we do not think it could do so on point (3).

---

**3.** Cebula's task would be even harder given his admission that neither Sharma nor Taken were personally prejudiced against him because of his age. This admission, though harmful to his story, is not fatal by itself. A manager could obey orders from above to view age unfavorably, but not *personally* believe age is relevant. In this regard, *LaMontagne*, 750 F.2d at 1412, is not controlling. There no evidence showed that the person who made the discharge decision,

the company President, had considered age. Although others in the company arguably considered age relevant, they made no decision concerning plaintiff and exerted no influence over the decisionmaker. *Id.* at 1412–13. Here Sharma's statement indicates that he, the person who made the discharge decision, did consider age, and that consideration might have come from above.

The central issue here on summary judgment "is whether the submissions of the parties give rise to a *reasonable* inference of discriminatory motive." *Parker v. Fed'l Nat'l Mtg. Ass'n*, 741 F.2d 975, 976 (7th Cir.1984) (emphasis added). Considering the whole record, the jury could not do so reasonably. The evidence is overwhelming that Cebula did not perform up to GE's legitimate expectations. We have already held that there is no genuine factual issue about GE's dissatisfaction. We now hold that there is no genuine issue that GE's dissatisfaction with Cebula's performance was a "but for" or "determining factor" in his discharge. No jury could reasonably find otherwise on the basis of this record.

We recognize that if Sharma made the alleged statement, as we must assume for purposes of deciding the motions before us that he did, it becomes possible that age too was a factor in the decision. But we do not think a jury could reasonably find, as it must for Cebula to win, that age was a *determining* factor. In general, two or more factors, or causes, can possibly be "determining ones." Both age and poor performance could factor into the discharge decision, such that "but for" either cause the employee would not have been fired. This is the so-called "mixed-motive" situation. *See, e.g., LaMontagne*, 750 F.2d at 1414 (age need only be a determining factor among others); *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1111–12 & n. 1 (4th Cir.1981), *cert. denied*, 454 U.S. 860, 102 S.Ct. 316, 70 L.Ed.2d 158 (1981); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1019 (1st Cir.1979). But even if GE's motives were mixed, the above cases make clear that to prevail a plaintiff must show that age made a difference in the outcome. If Cebula would have been fired anyway because of his poor performance, he has not shown that "but for" his age he would not have been fired, and he loses.

We think no genuine issue exists that Cebula would have been fired regardless of his age. Age did not determine the outcome. For five years he performed below expectations. Not only Sharma, but other supervisors felt he was inadequate. Finally, near the end, customers wrote complaints to GE about Cebula. GE would not have continued to risk losing business on Cebula's account. In sum, Cebula cannot overcome the evidence of his poor performance and persuade a reasonable jury that age also determined GE's decision to fire him. Accordingly, Cebula cannot succeed on the direct method of proof, as well as the *McDonnell-Douglas* method. We therefore grant GE's motion for summary judgment on the ADEA claim.

### The Illinois Eavesdropping Act

Both parties have moved for summary judgment on Count II, which states a claim under the Illinois Eavesdropping Act, Ill.Rev.Stat. ch. 38, ¶ 14–1 through 14–9 (1983). The Act creates a civil remedy for "eavesdropping ... practiced contrary to" the Act by an eavesdropper or his "principal." ¶ 14–6. A "principal" is defined as "any person who"

(1) Knowingly employs another who illegally uses an eavesdropping device in the course of such employment; or

(2) Knowingly derives any benefit or information from the illegal use of an eavesdropping device by another; or

(3) Directs another to use an eavesdropping device illegally on his behalf.

¶ 14–1(c). It is undisputed that Taken taped the conversation in which he fired Cebula. Assuming that Taken violated the Act, and did so in the course of his employment, we nevertheless believe that Cebula cannot hold GE liable as Taken's principal.

The Act is clear that one must "knowingly employ[ ] another" who violates the Act. The record of this case is clear that no GE supervisor knew of or directed Taken's decision to tape the meeting. As such, we hold that GE cannot be held liable as Taken's principal since it did not *knowingly* employ him to use the tape.[4] Nor can it be

4. Cebula's argument assumes that the Act's words "knowingly employ" merely mean that

GE must have known that it employed Taken. We disagree with this reading of the Act. Such

said that GE has "knowingly derived any benefit or information from [Taken's] illegal use" of the tape. When Sharma found out about the tape he reprimanded Taken, and GE destroyed the tape. Cebula has made no showing that its contents would have helped him or that they somehow benefitted GE. Thus, GE is likewise not a principal under ¶ 14(1)(C)(2).

In sum, no genuine factual issue exists as to whether GE is a principal under the Eavesdropping Act. It might be that Taken violated the Act, and that Cebula could have sued him, but he can no longer maintain his suit against GE for Taken's wrongdoing. As such, we need not consider the parties' remaining arguments concerning Count II.

### Conclusion

We grant GE's summary judgment motion on Counts I and II and deny Cebula's motion for summary judgment on Count II. It is so ordered.

a reading renders the word, "knowingly," superfluous, since the statute could make the same point without the word. We think it clear from the context of the statute that the employer must *know* that the employee is eavesdropping within the scope of his employment. This reading gives meaning to the word "knowingly."